Lisel M. Ferguson (Bar No. 207637)
Jamie D. Quient (Bar No. 279525)
PROCOPIO, CORY, HARGREAVES &
SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398
Email: lisel.ferguson@procopio.com
Email: Jamie.quient@procopio.com

Attorneys for Plaintiff
DIGITAL OUTFIT dba EXPO OUTFITTERS

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

DIGITAL OUTFIT, INC. dba EXPO OUTFITTERS, a California corporation,

Plaintiff,

v.

exhibiTEAM, a fictitious business operating in California; JOSHUA "MAC" PITTMAN, an individual; SCOTT ARBOGAST, an individual; and HEIDI FITZGERALD, an individual,

Defendants.

Case No. '17CV0970 BAS JLB

**COMPLAINT FOR CAUSES OF ACTION:**

1. **MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1831 ET SEQ.)**
2. **LANHAM ACT UNFAIR COMPETITION AND PASSING OFF (LANHAM ACT 15 U.S.C. § 1125(A))**
3. **DECLARATORY RELIEF**
4. **BREACH OF FIDUCIARY DUTY**
5. **BREACH OF CONTRACT (AGAINST PITTMAN)**
6. **BREACH OF CONTRACT (AGAINST ARBOGAST)**
7. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
8. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
9. **UNFAIR COMPETITION (BUSINESS & PROFESSIONS CODE § 17200)**

Comes now Plaintiff, DIGITAL OUTFIT, INC. dba EXPO OUTFITTERS ("Plaintiff" or "Digital Outfit"), a California Corporation organized and operated under the laws of the State of California, by its attorneys Lisel M. Ferguson and

Jamie D. Quient of Procopio, Cory, Hargreaves and Savitch, LLP, and alleges for its Complaint as follows:

## INTRODUCTION

1. This action arises out of actions taken by Joshua "Mac" Pittman, a former Digital Outfit employee, shareholder, officer and director, Scott Arbogast, a former independent contractor of Digital Outfit and Heidi Fitzgerald (collectively "Defendants") unlawful business practices, unfair competition, including but not limited to, use of Digital Outfit's confidential and proprietary information and trade secrets, interference with Digital Outfit's business relationships, creating a competing business, and other unlawful acts.

2. As set forth below, Digital Outfit has suffered damages as a result of Defendants' conduct, including but not limited to, the unlawful taking and use of its confidential and proprietary information and trade secrets and numerous additional unlawful acts as set forth below.

3. As a result, Digital Outfit, brings the instant action for: (1) Misappropriation of Trade Secrets (18 U.S.C. § 1831 et seq.); (2) Lanham Act Unfair Competition and Passing Office (Lanham Act 15 U.S.C. § 1125(A); (3) Declaratory Relief; (4) Breach of Fiduciary Duty (5) Breach of Contract (Against Pittman); (6) Breach of Contract (Against Arbogast); (7) Intentional Interference with Prospective Economic Advantage; (8) Negligent Interference with Prospective Economic Advantage; (9) Unfair Competition in Violation of Business & Professions Code § 17200.

4. Digital Outfit demands a jury trial of all legal and factual issues so triable.

## PARTIES

5. Plaintiff DIGITAL OUTFIT, INC. dba EXPO OUTFITTERS ("Digital Outfit") is a California corporation with its principal place of business at 8533 Production Avenue, San Diego, California, 92121.

6. Plaintiff is informed and believes that Defendant exhibiTEAM is a fictitious business registered with the San Diego County Assessor/Recorder/Clerk operating in California with its principal place of business at 12619 Spindletop Rd., San Diego 92129.

7. Plaintiff is informed and believes that Defendant JOSHUA “MAC” PITTMAN, an individual, is a California citizen who resides in San Diego, California.

8. Plaintiff is informed and believes that Defendant SCOTT ARBOGAST, an individual, is a California citizen who resides in San Diego, California.

9. Plaintiff is informed and believes that Defendant HEIDI FITZGERALD, an individual, is a California citizen who resides in San Diego, California.

10. Plaintiff is informed and believes that JOSHUA “MAC” PITTMAN is a former employee, shareholder, officer and director of Plaintiff Digital Outfit.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1125(A) and 18 U.S.C. § 1832. This Court has supplemental jurisdiction over Plaintiff’s state law claims pursuant to 28 U.S.C. § 1367.

12. This Court has personal jurisdiction over Defendants because Defendants conduct business in California. The individual Defendants are all residents of San Diego, California and have conducted business in San Diego and exhibiTEAM has its principal place of business in this judicial district and its business operations occur in San Diego and elsewhere in California.

13. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Plaintiff is informed and believes that Defendants are all California residents and of the Southern District of California and a substantial part of the events giving rise to the claims occurred, and continue to occur, in the Southern

District of California. Further, Plaintiff has suffered damage within this District, and elsewhere.

## FACTUAL BACKGROUND

### A. Digital Outfit

14. Plaintiff Digital Outfit is, and at all times relevant to the matters alleged in this Complaint in the business of selling creative print, and exhibit services, promotional products, as well as, selling and renting trade show displays.

15. Digital Outfit was established in 1999 and operated for its first twenty-six months as a sole proprietorship.

16. Digital Outfit operated as a partnership for fourteen years from February 2002 to February 28, 2016.

17. Digital Outfit incorporated in the State of California on March 1, 2016.

18. Digital Outfit markets and advertises its creative, print, promotional products and exhibit services and its trade show displays to its customers and potential customers online through its websites www.digitaloutfit.com, and www.ExpoOutfitters.com, through direct email marketing, and its sales team.

19. Digital Outfit's website includes renderings of its portable trade show displays and other images that are uniquely associated with its products.

20. Digital Outfit has a diverse customer base, including but not limited to healthcare, pharmaceutical, government agencies, technology, advertising, marketing, manufacturing finance and retail, a number of which are located within this judicial district.

21. In light of Digital Outfit's valid and continuous use of the Digital Outfit trade dress since December 1999 and Digital Outfit's notoriety as the source of print and exhibit services and trade show displays in a variety of industries, the consuming public associates print, promotional products and exhibit services and trade show displays with Digital Outfit. Digital Outfit has developed extensive goodwill and consumer recognition, built up by and through Digital Outfit's

substantial time, effort and resources dedicated to advertising, marketing, promotional activities and sales. The Digital Outfit consumer recognition and the goodwill associated therewith are valuable assets belonging to Digital Outfit.

22. In order to achieve its business objectives and achieve a strategic position in the marketplace, Digital Outfit developed and maintained a confidential customer database from a multitude of sources over the course of several years. Digital Outfit's customer database includes information about its actual and prospective customers' businesses, specific product and service needs, key contacts, purchase history, sales data, event and planning schedules.

23. Digital Outfit also achieved its business objectives by developing its own financial programs, specific methods and strategies for bidding on projects, computer programs and tools for data collection and strategic analysis.

24. Digital Outfit further compiled information and knowledge from a multitude of sources over the last eighteen years it has been in business relating to its specific product and service needs, key contacts, purchase history and sales data.

25. Digital Outfit works directly with Pascale Engineering and print vendors on Digital Outfit's portable exhibit sales products such as Exhibitline.

**B. Pittman's Former Ownership and Officer and Director Status and Employment at Digital Outfit**

26. Prior to Digital Outfit's incorporation, Pittman was a partner with Won Chae Matthews of Digital Outfit. Pittman's role in the company included managerial tasks such as bookkeeping, payroll, vendor invoice payment and some business development, sales and marketing, and order fulfillment.

27. Pittman also entered an Employment Agreement with Digital Outfit on or about March 1, 2016. A true and correct copy of the Employment Agreement is attached as Exhibit A.

28. Pursuant to the Employment Agreement, Pittman became Digital Outfit's president and a member of Digital Outfit's three-member board of directors.

29. The Employment Agreement required Pittman to "devote his full-time and best efforts to preforming his duties and to [Digital Outfit's] business affairs."

30. The Employment Agreement further required Pittman to "devote substantially all of his business time and attention to the performance of his duties" as set forth in the Agreement. Exhibit A, page 1.

31. The Employment Agreement prohibited Pittman from "directly indirectly…engag[ing] in any activity or other business competitive with [Digital Outfit]'s business…" Exhibit A, page 2.

32. The clause prohibiting competing activities provided further that Pittman "shall not engage in any other business or directly or indirectly…promote, participate, or engage in any activity or other business competitive with [Digital Outfit's] business…" Exhibit A, page 2.

33. The Employment Agreement also included a clause regarding "Confidential Proprietary Obligations," which provides in relevant part:

> During the Term of Employment under this Agreement, [Pittman] shall have access to and become acquainted with confidential, proprietary, and trade secret information of Employer and its Affiliates…if any (collectively Proprietary Information"), including but not limited to information or plans concerning Employer's and its Affiliates' customer relationships; personnel; sales, marketing, and financial operations and methods; trade secrets; formulas; devices; secret inventions; processes; and other compilations of information, records and specifications. [Pittman] shall not disclose any Confidential Proprietary Information directly or indirectly, or use it in any way, either during the term of this Agreement or at any time thereafter, except as reasonably necessary in the course of his [ ] employment for [Digital Outfit] or as authorized in writing by [Digital Outfit]. [Pittman] acknowledges that the sale or unauthorized use or disclosure of any Confidential or Proprietary Information is unfair competition with [Digital Outfits]. All files, records, documents, computer-recorded or electronic information, drawings, specifications, equipment, and similar items relating to the business of [Digital Outfit] or its Affiliates, whether prepared by [Digital Outfit] or otherwise coming into his [ ] possession, shall remain [Digital Outfits] or its Affiliates' exclusive property and shall not be removed from [Digital Outfit's] premises under any circumstances whatsoever without [Digital Outfit's] prior written consent, except when (and only for the period) necessary to carry out [Pittman's] duties hereunder, and if removed shall be immediately returned to [Digital Outfit] on termination of employment, and no copies shall be kept by [Pittman.]

Exhibit A, pages 3-4.

34. As President and as a Director, Pittman owed Digital Outfit fiduciary duties, including the duty of loyalty and candor.

35. When Digital Outfit incorporated, Pittman and Won Chae Matthews, the sole shareholders of Digital Outfit executed a Buy-Sell Agreement (the "Buy-Sell Agreement") on or about March 1, 2016. A true and correct copy of the Buy-Sell Agreement is attached as Exhibit B.

36. In his role as President, Pittman had access to Digital Outfit's confidential and proprietary information, including but not limited to, its confidential customer database, financial information, project templates, proposals, and marketing processes.

37. Because the information Pittman had access to in his role as a partner and later President of Digital Outfit to information that was not readily available to, or easily compiled by, Digital Outfit's competitors. This information is incredibly valuable to Digital Outfit.

38. In his role as a partner and later President of Digital Outfit, Pittman also developed a detailed knowledge of Digital Outfit's processes, procedures and workflow related to the manner in which Digital Outfit works with its vendors, as well as the contact information, pricing, and margin information and other information related to Digital Outfit's vendors.

39. In his role as a partner and later President of Digital Outfit, Pittman also provided extensive training to Arbogast to enable him to work directly with Pascale Engineering, labor providers, freight companies, flooring vendors, exhibit builders and other exhibit and print vendors on Digital Outfit's sales including promotional products, freight logistics, installation and dismantle labor, exhibit sales and rentals.

40. In his role as a partner and later President of Digital Outfit, Pittman had access to non-public exhibit renderings prepared by Digital Outfit's third-party

vendors for Digital Outfit's clients.

**C. Arbogast's Independent Contractor Work on Behalf of Digital Outfit**

41. Arbogast was retained by Digital Outfit as an independent contractor to serve as Digital Outfit's primary salesperson on our around November 2012. He left for a time and came back around August 2013.

42. In or around March 2016, after Digital Outfit incorporated, Arbogast signed an independent salesperson agreement.

43. In this role, Arbogast was responsible for developing and maintaining the Digital Outfit Salesforce customer relationship management platform and leads database, incorporating this database into the Digital Outfit email marketing campaign, and developing and sending out email marketing campaigns.

44. During the term of his relationship with Digital Outfit, Arbogast had access to Digital Outfit's confidential and proprietary information, including but not limited to, its customer database and information Digital Outfit compiled from a multitude of sources over several years about its actual and prospective customers' business, specific product and service needs, key contacts, purchase history, and sales data.

45. During his training, Arbogast was provided with access to Digital Outfit's processes, procedures and workflow related to the manner in which Digital Outfit works with its vendors, as well as the contact information, pricing, and margin information and other information related to Digital Outfit's vendors.

46. In his capacity as a Digital Outfit salesperson, Arbogast periodically received non-public exhibit renderings prepared by Digital Outfit's third-party vendors for Digital Outfit's clients.

47. Because the information Arbogast had access to in his role as an independent contractor for Digital Outfit was not readily available to, or easily compiled by, Digital Outfit's competitors, this information is incredibly valuable to Digital Outfits.

48. To protect the value of its confidential information, Digital Outfit required Arbogast to sign a Contractor Confidentiality and Proprietary Rights Agreement ("Confidentiality Agreement") on March 22, 2016. A true and correct copy of the Confidentiality Agreement is attached as Exhibit C.

49. In executing the Confidentiality Agreement, Arbogast agreed to certain obligations and restrictions concerning his use and disclosure of Digital Outfit's "Confidential Information," as that term is defined in Paragraph 1(a) of the Confidentiality Agreement. Among other things, Arbogast agreed:

> "[T]o treat all Confidential Information as strictly confidential";
>
> "[N]ot to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow or be disclosed, published, communicated or made available, in whole or part, to any entity or person . . . not having a need to know and authority to know and use the Confidential Informaion in connection with the business of [Digital Outfit]";
>
> "[N]ot to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the [Digital Outfit], except as required in the performance of [your] authorized . . . duties to [Digital Outfit]";
>
> To "provide or return to [Digital Outfit] all [Digital Outfit] property, including . . . reports, files, . . . work product, e-mail messages, . . . and all [Digital Outfit] documents and materials belonging to [Digital Outfit] that constitute or contain any Confidential Information or Work Product" upon his termination; and
>
> To "delete or destroy all copies of any [Digital Outfit' documents and material not returned to [Digital Outfit] that remain in [your] possession or control, including those stored on any non-[Digital Outfit] devices, networks, storage locations and media in[his] possession and control" upon his termination.

**D. Defendants' Unlawful Acts**

50. Based on information and belief on or around May 2016, one or more of Defendants used the confidential information they obtained through their work with Digital Outfits to create a competing business doing business as "exhibiTEAM."

51. Digital Outfit is informed and believes that on or around May 2016, one or more of the Defendants registered and created the internet domain name

www.exhibiteam.net.

52. On May 6, 2016, Arbogast received a complete list of Digital Outfit's current clients and total spending for fiscal year 2015 and year to date 2016. Arbogast had no legitimate need for the financial history of Digital Outfit to render services to Digital Outfit.

53. Digital Outfit is informed and believes that Pittman and Arbogast solicited Digital Outfit's current and prospective clients for business on behalf of exhibiTEAM while still employed by and representing Digital Outfit.

54. On June 20, 2016, Pittman sent Arbogast an email enclosing copies of Digital Outfit's winning proposal for a project with the Centers for Disease Control ("CDC") and the Work Breakdown Structure ("WBS") developed by Digital Outfit's CEO as a blueprint for effectively managing trade show projects from beginning to end. This WBS was highly confidential and proprietary.

55. Arbogast was not involved in the CDC project and had no legitimate need for the technical proposal or WBS to render services to Digital Outfit.

56. On or about July 22, 2016, Fitzgerald, Arbogast's girlfriend and Pittman's sister-in-law, registered exhibiTEAM as a fictitious business name with the San Diego County Assessor/Recorder/Clerk.

57. In or around August 2016, the exhibiTEAM website went live.

58. Several renderings currently appearing on the exhibiTEAM website are non-public renderings prepared for Digital Outfit's clients.

59. Digital Outfit is informed and believes that exibiTEAM is directly competing with Digital Outfit by contacting Digital Outfit's existing and prospective customers and selling and attempting to rent and sell identical products and services as Digital Outfit including creative, print, promotional products and exhibit services, including Pascale Engineering products such as Exhibitline.

60. Digital Outfit is informed and believes that Pittman has forwarded client leads to Arbogast and that those projects have resulted in projects for

exhibiTEAM.

61. Digital Outfit's new and existing client sales dropped precipitously immediately following the launch of exhibiTEAM.

62. On October 7, 2016, Arbogast terminated an automatic web to lead response feature that had been set up on Digital Outfit's website.

63. On October 12, 2016, after discovering the aforementioned unlawful acts, Digital Outfit terminated Arbogast's email access. Immediately thereafter, Arbogast accessed Digital Outfit's Salesforce portal and deleted a number of records pertaining to Digital Outfit's customers and expunged the same from the trash bin. Digital Outfit is informed and believes that exhibiTEAM is now providing services to these customers.

64. Digital Outfit is informed and believes that Arbogast and/or Pittman also downloaded or copied customer information and data from Digital Outfit's Salesforce portal. Digital Outfit is informed and believes that exhibiTEAM is now providing services to some of the customers listed in its Salesforce portal.

65. Pittman and Arbogast failed to perform their duties for Digital Outfit from around May 2016 through October 2016, the period they are believed to have been starting their competing business.

66. On October 28, 2016, following the discovery of Defendants' unlawful acts, Pittman was suspended without pay pursuant to the terms of his employment agreement while Digital Outfit investigated Defendants' unlawful acts.

67. On or about November 30, 2016, Digital Outfit provided Pittman written notice of its termination of Pittman's employment.

68. On December 14, 2016, Pittman resigned as a member of the Board of Directors of Digital Outfit.

69. On December 27, 2016, pursuant to the terms of the Buy-Sell Agreement, Digital Outfit's certified public accountants, Catalono & Associates ("C & A") provided Digital Outfit with a valuation of Digital Outfit's shares. C & A

calculated that the purchase price for Digital Outfit's shares was negative $55.32 per share.

70. On January 17, 2017, Won Chae Matthews, the majority shareholder of Digital Outfit, provided Pittman written notice that he was exercising his right under the Buy-Sell Agreement to purchase Pittman's 490 shares in Digital Outfit and tendered the purchase price consideration in the amount of $490.00 based on C & A's valuation of the shares.

71. On or about January 20, 2017, the Directors of Digital Outfit executed the Unanimous Written Consent of Directors, authorizing the transfer of Digital Outfit's stock to Won Chae Matthews pursuant to the terms of the Buy-Sell Agreement and approved the removal of Pittman as the President of Digital Outfit.

72. Despite Won Chae Matthews' good faith tender of the purchase price consideration in the amount mandated by the Buy-Sell Agreement, Pittman wrongfully and in breach of the Buy-Sell Agreement refused to accept the $490.00 purchase price consideration for his 490 shares.

73. Digital Outfit maintains a corporate bank account at Wells Fargo (the Digital Outfit Wells Fargo Account).

74. Plaintiff is informed and believes and thereon alleges that on or about February 28, 2017, Pittman wrongfully represented to Wells Fargo bank that he holds a right, title, interest or claim to the Digital Outfit Wells Fargo Account.

75. On or about March 1, 2017, Wells Fargo placed an administrative freeze on the Digital Outfit Wells Fargo Account based on Pittman's wrongful claim he holds a right, title or interest in Digital Outfit's Wells Fargo Account.

## FIRST CAUSE OF ACTION

### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act (18 U.S.C. § 1831 *et seq.*)) – Against All Defendants)

76. Digital Outfit owned various trade secrets including, but not limited to, work product, business processes, proposal formats, sales history, email marketing

programs, customer lists, customer databases, and customer-specific research.

77. This information was secret and had actual or potential independent value because it was secret and was a valuable asset of Digital Outfit's business.

78. Digital Outfit went to great lengths to ensure that its trade secrets remained confidential by, among other things, requiring its employees and independent contractors, including Pittman and Arbogast, to sign agreements wherein they agreed to maintain the confidentiality of Digital Outfit's trade secrets.

79. Defendants, and each of them, improperly acquired, used, disclosed, and misappropriated Digital Outfit's confidential information.

80. On or around May 2016, Defendants used the confidential information they obtained through their work with Digital Outfit to create a competing business, exhibiTEAM.

81. Defendants, and each of them, used Digital Outfit's trade secrets, including but not limited to Digital Outfit's confidential client database, to develop business for their competing business from Digital Outfit's clients and potential clients.

82. Defendants, and each of them, used Digital Outfit's confidential information and trade secrets, including but not limited to, its customer relationships, sales and marketing strategies, financial operations, methods, processes, information including digital assets (images, renderings, plans, estimates, invoices and/or photographs), records, event schedules, key contacts and vendors, without Digital Outfit's authorization or consent to benefit their competing business after Digital Outfit.

83. Pittman refused to return Digital Outfit's company laptop, cell phone and other electronics, vehicles and other company-issued items. Digital Outfit is informed and believes Pittman is using these items in connection with his work on behalf of exhibiTEAM.

84. Pittman also created another business by the name of "Zeal Brands."

Digital Outfit is informed and believes that Pittman is also competing with Digital Outfit through this business.

85. On May 6, 2016, Arbogast received a complete list of Digital Outfit's current clients and total spending for fiscal year 2015 and year to date 2016. Arbogast had no legitimate need for the financial history of Digital Outfit to render services to Digital Outfit.

86. On June 20, 2016, Pittman sent Arbogast an email enclosing copies of Digital Outfit's winning proposal for a project with the Centers for Disease Control ("CDC") and the Work Breakdown Structure ("WBS") developed by Digital Outfit's CEO as a blueprint for effectively managing trade show projects from beginning to end. This WBS was highly confidential and proprietary.

87. Arbogast was not involved in the CDC project and had no legitimate need for the technical proposal or WBS to render services to Digital Outfit.

88. Digital Outfit is informed and believes that Defendants took its clients, information, price proposals and designs to another competing company, exhibiTEAM.

89. ExibiTEAM is directly competing with Digital Outfit by selling exhibit services and by selling and renting trade show displays, including Pascale Engineering products such as Exhibitline.

90. Digital Outfit is informed and believes that Pittman has forwarded client leads to Arbogast and that those projects have resulted in projects for exhibiTEAM.

91. Digital Outfit experienced a precipitous drop in its new and existing client sales during the period when Defendants launched their competing business using Digital Outfit's trade secrets.

92. Defendant's also harmed Digital Outfit's brand, reputation and goodwill through its unauthorized use of Digital Outfit's trade secrets and solicitation of Digital Outfit's new and existing customers.

93. Defendants, and each of them, were unjustly enriched as a result of Defendants' improper acquisition and use of its trade secrets.

94. Defendant's improper acquisition and use of Digital Outfit's trade secrets was a substantial factor in causing the drop in sales experienced by Digital Outfit.

## SECOND CAUSE OF ACTION

**(Lanham Act Unfair Competition and Passing Off)**

**(Lanham Act 15 U.S.C. § 1125(A) – Against All Defendants)**

95. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

96. Defendants have engaged in unfair competition and passing off by their multiple unauthorized acts, namely, copying and using Digital Outfit's trade secrets, goods and service likeness in its advertising and websites, without Digital Outfit's permission or consent in connection with their competing business. Among other acts, Defendants have copied and are using several renderings prepared for Digital Outfit's clients on its website and in its marketing and advertising.

97. Arbogast also used his personal email and personal phone number to communicate with Digital Outfit customers, creating confusion and passing off his business interactions as done on behalf of Digital Outfit, when really done for the benefit of a competing company.

98. Defendants' copying and use of Digital Outfit's goods and service likeness in their advertising and websites is likely to cause mistake, confusion, and to deceive consumers as to the affiliation, connection, or association of Defendants' competing business with Digital Outfit.

99. Defendants committed such acts with the intent to trade upon Digital Outfit's reputation and goodwill by causing confusion and mistake amongst customers and the public, and deceiving the public into believing Defendants'

business is associated with, sponsored by, approved by and/or condoned by Digital Outfit.

100. Defendants have further committed such acts with the intent to cause confusion and mistake amongst customers and the public, deceiving the public into believing that Defendants' competing business is associated with, sponsored by, approved by and/or is actually Digital Outfit. These acts constitute passing off and false advertising in violation of 15 U.S.C. § 1125(a).

101. Defendants' actions were likely to cause confusion among consumers.

102. Defendants' actions have irreparably injured Digital Outfit and damaged Digital Outfit in an amount to be determined at trial.

103. Unless enjoined by this Court, Defendants will continue their course of conduct, wrongfully advertising, using, infringing upon, selling and otherwise profiting from Digital Outfit's trade dress and similar goods. As a direct and proximate result of the acts of Defendants, Digital Outfit will suffer irreparable damage and will sustain lost profits. Digital Outfit will lose the benefit of the advertising and goodwill for which Digital Outfit has expended large sums of money, time and effort promoting during the past eighteen years, and Digital Outfit will also lose large sums of money in diverted business.

104. Digital Outfit has no adequate remedy at law to address all of the injuries Defendants have caused, and intend to cause by their conduct. Digital Outfit will suffer irreparable damage and sustain loss of profits until Defendants' actions alleged herein are enjoined by this Court.

## THIRD CAUSE OF ACTION

**(Declaratory Relief – Against Joshua "Mac" Pittman)**

105. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

106. Plaintiff is informed and believes and thereon alleges that Pittman

claims he has a right, title, interest or claim to the Digital Outfit Wells Fargo Bank Account or any rights, title, interest or claim to Digital Outfit whatsoever.

107. Plaintiff is informed and believes and thereon alleges that Pittman has no valid right, title, interest or claim to the Digital Outfit Wells Fargo Bank Account.

108. A genuine controversy exists between Plaintiff and Pittman concerning the Digital Outfit Wells Fargo Bank Account.

109. Plaintiff seeks a determination from the Court that Pittman has no right, title, interest or claim to the Digital Outfit Wells Fargo Bank Account.

**FOURTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty – Against Joshua "Mac" Pittman)**

110. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

111. As President and a director of Digital Outfit, Pittman was an officer of the company.

112. Prior to Digital Outfit's incorporation on March 1, 2016, Pittman was a partner of the company.

113. Pittman acted on behalf of Digital Outfit for the purpose of paying invoices to Digital Outfit's vendors and paying other bills.

114. Pittman failed to act as a reasonably careful officer/partner would have acted under similar circumstances.

115. Pittman also acted against the interests of Digital Outfit by improperly acquiring, using and disclosing Digital Outfit's trade secrets and starting competing businesses, exhibiTEAM and Zeal Brands.

116. Pittman also acted on behalf of exhibiTEAM, a company whose interests are adverse to Digital Outfit's.

117. Digital Outfit did not give Pittman informed consent to acquire, use or

disclose its trade secrets or start a competing business.

118. Digital Outfit was harmed by Pittman's failure to pay the company's invoices and bills, his unauthorized acquisition and use of its trade secrets and his involvement in starting a competing business.

119. Pittman's lack of communication and/or deliberate concealment of information caused significant harm to Digital Outfit, including but not limited to its credit and ability to operate effectively.

120. Pittman's conduct was a substantial factor in causing Digital Outfit harm.

**FIFTH CAUSE OF ACTION**

**(Breach of Contract – Against Joshua "Mac" Pittman)**

121. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

122. On March 1, 2016, Pittman entered into an Employment Agreement with Digital Outfit to employ Pittman as the company's president.

123. The Employment Agreement prohibited Pittman from engaging in outside business activities and from engaging in competitive activities.

124. The Employment Agreement also prohibited Pittman from any unauthorized use of its confidential proprietary information.

125. Pittman acted as President for Digital Outfit pursuant to their Agreement and the Terms and Conditions until he was terminated by Digital Outfit on November 30, 2016.

126. During the term of the contract, Pittman engaged in outside business and competitive activities, including assisting a competing business, exhibiTEAM and soliciting Digital Outfit's current clients and client prospects.

127. During the term of the contract, and after his termination, Pittman, improperly acquired, used, disclosed, and misappropriated Digital Outfit's

confidential information.

128. Pittman used Digital Outfit's trade secrets, including but not limited to Digital Outfit's confidential client database, to develop business for their competing business from Digital Outfit's clients and potential clients.

129. Pittman also used Digital Outfit's confidential information and trade secrets, including but not limited to, its customer relationships, sales and marketing strategies, financial operations, methods, processes, information, records, and vendors, without Digital Outfit's authorization or consent to benefit Defendants' competing business after Digital Outfit.

130. Pittman also created another business by the name of "Zeal Brands." Digital Outfit is informed and believes that Pittman is also competing with Digital Outfit through this business.

131. Pittman also improperly converted a Digital Outfit insurance policy. Pittman had the option to purchase this policy from the company, but instead cashed it out without permission or authorization from Digital Outfit.

132. On June 20, 2016, Pittman sent Arbogast an email enclosing copies of Digital Outfit's winning proposal for a project with the Centers for Disease Control ("CDC") and the Work Breakdown Structure ("WBS") developed by Digital Outfit's CEO as a blueprint for effectively managing trade show projects from beginning to end. This WBS was highly confidential and proprietary. Arbogast was not involved in the CDC project and had no legitimate need for the technical proposal or WBS to render services to Digital Outfit.

133. Digital Outfit is informed and believes that Pittman has forwarded client leads to Arbogast and that those projects have resulted in projects for exhibiTEAM.

134. Digital Outfit is informed and believes that Pittman in conjunction with Arbogast downloaded or copied customer information and data from Digital Outfit's Salesforce portal. Digital Outfit is informed and believes that exhibiTEAM

is now providing services to some of the customers listed in its Salesforce portal.

135. After his termination Pittman failed to return Digital Outfit's trade secrets, business records, and other items taken from the company including his company laptop, cell phone and other electronics, vehicles and other company-issued items.

136. Digital Outfit fully and at all times performed its part of the Employment Agreement.

137. Pittman breached the Employment Agreement with Plaintiff by, among other things, failing to return Plaintiff's trade secrets and company property and continuing to use Plaintiff's trade secrets after his termination.

138. As a result of the foregoing and Pittman's continued and ongoing breaches of the Employment Agreement, Digital Outfit has suffered damages in the amount to be proven at the time of trial.

## SIXTH CAUSE OF ACTION

**(Breach of Contract – Against Scott Arbogast)**

139. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

140. On March 22, 2016, Arbogast entered into a Contractor Confidentiality and Proprietary Rights Agreement ("Confidentiality Agreement") with Digital Outfit.

141. The Confidentiality Agreement prohibited Arbogast from disclosing Digital Outfit's confidential information or using it without express authority to do so.

142. On or around May 2016, Arbogast used the confidential information he obtained through his work with Digital Outfits to create a competing business exhibiTEAM.

143. On May 6, 2016, Arbogast received a complete list of Digital Outfit's

current clients and total spending for fiscal year 2015 and year to date 2016. Arbogast had no legitimate need for the financial history of Digital Outfit to render services to Digital Outfit.

144. Arbogast also received other salespeople's client lists, sales volume and commissions paid out and other information he had no legitimate need to access.

145. On June 20, 2016, Pittman sent Arbogast an email attaching copies of Digital Outfit's winning proposal for a project with the Centers for Disease Control ("CDC") and the Work Breakdown Structure ("WBS") developed by Digital Outfit's CEO as a blueprint for effectively managing trade show projects from beginning to end. This WBS was highly confidential and proprietary.

146. Arbogast was not involved in the CDC project and had no legitimate need for the technical proposal or WBS to render services to Digital Outfit.

147. Digital Outfit is informed and believes that Pittman has forwarded client leads to Arbogast and that those leads have resulted in projects for exhibiTEAM.

148. On October 7, 2016, Arbogast terminated an automatic Web to Lead response feature that had been set up on Digital Outfit's website. Digital Outfit is informed and believes that the deleted auto-response provided anyone who filled out the "Contact Us" form with an email naming Arbogast as the contact so he could steer Digital Outfit's business to himself.

149. On October 12, 2016, after discovering the aforementioned unlawful acts, Digital Outfit terminated Arbogast's email access. Immediately thereafter, Arbogast accessed Digital Outfit's Salesforce portal and deleted a number of records pertaining to Digital Outfit's customers. Digital Outfit is informed and believes that exhibiTEAM is now providing services to these customers.

150. Digital Outfit is informed and believes that Arbogast also downloaded or copied customer information and data from Digital Outfit's Salesforce portal.

151. Digital Outfit is informed and believes that Arbogast has in his possession copies of Digital Outfit's email lists.

152. Digital Outfit fully and at all times performed its part of the Confidentiality Agreement.

153. Arbogast breached the Confidentiality Agreement with Digital Outfit by, among other things, failing to return Digital Outfit's trade secrets and company property and continuing to use Digital Outfits' trade secrets after he was terminated by Digital Outfit.

154. As a result of the foregoing and Arbogast's continued and ongoing breaches of the Confidentiality Agreement, Digital Outfit has suffered damages in the amount to be proven at the time of trial.

**SEVENTH CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Advantage – Against All Defendants)**

155. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

156. Digital Outfit had existing economic relationships with its customers that probably would have resulted in an economic benefit to Digital Outfit in the form of new business from these customers.

157. Digital Outfit created a confidential and proprietary customer database compiled from a multitude of sources over several years about its actual and prospective customers' business, specific product and service needs, key contacts, purchase history and sales data.

158. Pittman and Arbogast had access to Digital Outfit's customer database in their roles with Digital Outfit. Through this access to Digital Outfit's customer database and other customer information, Defendants knew or should have known about these customer relationships.

159. Pittman and Arbogast shared Digital Outfit's customer database and other information they knew about Digital Outfit's customers with exhibitTEAM and Fitzgerald without authorization from Digital Outfit.

160. Defendants used the information they learned through their unauthorized acts to interfere with Digital Outfit's existing customer relationships by soliciting these Digital Outfit customers and convincing them to bring their business to exhibiTEAM or elsewhere.

161. Defendants' attempts to solicit business from Digital Outfit's customers were intended to disrupt these existing client relationships, or at the very least Defendant's knew that by attempting to solicit business from Digital Outfit's customers they were certain or substantially certain to disrupt these relationships.

162. Digital Outfit was harmed in that some of these customers took their business to exhibiTEAM or to other vendors.

163. Defendants' solicitation of Digital Outfit's customers was a substantial factor in causing Digital Outfit's loss of business from these customers.

**EIGHTH CAUSE OF ACTION**

**(Negligent Interference with Prospective Economic Advantage – Against All Defendants)**

164. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

165. Digital Outfit had existing economic relationships with its customers that probably would have resulted in an economic benefit to Digital Outfit in the form of new business from these customers.

166. Digital Outfit created a confidential and proprietary customer database compiled from a multitude of sources over several years about its actual and prospective customers' business, specific product and service needs, key contacts, purchase history and sales data.

167. Pittman and Arbogast had access to Digital Outfit's customer database in their roles with Digital Outfit. Through this access to Digital Outfit's customer database and other customer information, Defendants knew or should have known about these customer relationships.

168. Defendants knew or should have known that these client relationships would be disrupted if they failed to act with reasonable care.

169. Defendants knew or should have known that their attempts to solicit business from Digital Outfit's customers would disrupt Digital Outfit's existing client relationships.

170. Pittman and Arbogast failed to act with reasonable care by sharing Digital Outfit's customer database and other information they knew about Digital Outfit's customers with exhibitTEAM and Fitzgerald without authorization from Digital Outfit.

171. Defendants failed to act with reasonable care by using the information they learned through their unauthorized acts to interfere with Digital Outfit's existing customer relationships by soliciting these Digital Outfit customers and convincing them to bring their business to exhibiTEAM.

172. Digital Outfit was harmed in that some of these customers took their business to exhibiTEAM.

173. Defendants' solicitation of Digital Outfit's customers was a substantial factor in causing Digital Outfit's loss of business from these customers.

## NINTH CAUSE OF ACTION

**(Unfair Competition in Violation of Bus. & Prof. Code § 17200, et seq. – Against All Defendants)**

174. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in each paragraph above as though the same were set forth in full herein.

175. As set forth above, Defendants misappropriated Digital Outfit's trade

secrets, attempted to and did in fact create consumer confusion between Digital Outfit and their competing business exhibitTEAM and interfered with Digital Outfit's current and prospective customer relationships.

176. Defendants' aforementioned actions constitute unfair business practices in violation of California Business & Professions Code 17200, et seq.

177. Defendants' aforementioned actions constitute unlawful, unfair, malicious and/or fraudulent practices. As a result of Defendants' actions of negligent interference with prospective economic relations, Plaintiff has been injured and lost money in an amount to be determined at trial.

178. By their actions, Defendants have irreparably harmed and injured Plaintiff. Such irreparable injury will continue unless this Court preliminarily and permanently enjoins Defendants from further violation of Digital Outfit's rights, for which Digital Outfit has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against each Defendant as follows:

**As to the first claim for relief:**

1. The Defendants be adjudged to have willfully infringed Plaintiff's trade secrets in violation of the California Uniform Trade Secret Act (Civil Code § 3426, et seq.);
2. General, consequential and special damages according to proof at trial;
3. Punitive damages in an amount up to twice the amount of Plaintiff's actual damages due to Defendants' willful and malicious infringement of its trade secrets;
4. Preliminary and permanent injunctive relief, including but not limited to an injunction prohibiting Defendants from advertising, using, infringing upon, selling and otherwise profiting from Digital Outfit's trade secrets and other confidential and proprietary information;

5. For reasonable attorney's fees due to Defendants' willful and malicious infringement of its trade secrets.

**As to the second claim for relief:**

1. That Defendants be adjudged to have engaged in unfair competition and passing off in violation of federal law;
2. General, consequential and special damages in an amount according to proof;
3. Damages for lost profits and goodwill in a sum according to proof at trial pursuant to 15 U.S.C. § 1125;
4. Disgorgement of Defendants' profits;
5. Preliminary and permanent injunctive relief, including but not limited to an injunction prohibiting Defendants from advertising, using, infringing upon, selling and otherwise profiting from Digital Outfit's trade dress and similar goods;
6. Attorney's fees for wrongful, willful and deliberate action under 17 U.S.C. § 1051, *et seq*.;
7. Costs of suit incurred herein;
8. That Defendants and their officers, agents, employees and all persons acting or claiming to act on their behalf under their direction or authority, be permanently enjoined and restrained from engaging in acts of passing off and unfair competition with Plaintiff's business; and
9. Such other and further relief the Court deems just and proper.

**As to the third claim for relief:**

1. A declaration from the Court that Pittman has no right, title, interest or claim to the Digital Outfit Wells Fargo Bank Account or any rights, title, interest of claim to Digital Outfit whatsoever.
2. A declaration from the Court that the Digital Outfit Wells Fargo Bank Account be unfrozen and that Digital Outfit is entitled to access that account.

**As to the fourth claim for relief:**

1. General, consequential and special damages according to proof at trial;
2. Punitive damages;
3. Interest thereon at a maximum legally permissible rate;
4. Reasonable attorney's fees;
5. Costs of suit incurred herein; and
6. Such other relief as the Court deems just and proper.

**As to the fifth, sixth and seventh claims for relief:**

1. Damages in a sum according to proof at trial;
2. Interest thereon at a maximum legally permissible rate;
3. Reasonable attorney's fees;
4. Costs of suit incurred herein; and
5. Such other relief as the Court deems just and proper.

**As to the eighth and ninth Claims for Relief:**

1. That Defendants be adjudged to have intentionally and/or negligently interfered with Plaintiff's prospective economic relations;
2. That Defendants and its officers, agents, employees and all persons acting or claiming to act on their behalf under their direction or authority, be permanently enjoined and restrained from or engaging in acts of intentional interference of Plaintiff's prospective economic relations;
3. That Defendants and its officers, agents, employees and all persons acting or claiming to act on their behalf under their direction or authority, be permanently enjoined and restrained from or engaging in acts of negligent interference of prospective economic relations;
4. That Defendants be ordered to pay damages for intentional and negligent interference with prospective economic relations, in an amount to be proven at trial; and
5. Such other and further relief as the Court deems just and proper.

**As to all claims for relief:**

1. General, consequential and special damages in an amount according to proof;
2. Punitive damages in an amount according to proof;
3. Interest thereon at a maximum legally permissible rate;
4. Preliminary and permanent injunctive relief;
5. Costs of suit;
6. Attorneys' fees; and
7. Such other and further relief as the Court deems just and proper.

DATED: May 10, 2017

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

By: s/Lisel M. Ferguson
Lisel M. Ferguson
Jamie D. Quient
*Attorneys for Plaintiff* DIGITAL OUTFITS dba EXPO OUTFITS